IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


SANDY HAYES,                    )
                                )
          Plaintiff,            )
                                )
     v.                         )    CIVIL NO. 1:04CV00178
                                )
LOWE'S FOOD STORES, INC.,       )
                                )
          Defendant.            )


MEMORANDUM OPINION

BULLOCK, District Judge

   Plaintiff Sandy Hayes filed this action against Lowe's Food Stores, Inc. ("Defendant" or "Lowe's") on February 26, 2004, alleging a hostile work environment based on sexual harassment and retaliatory discharge, each in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as well as wrongful discharge in violation of North Carolina public policy, codified at N.C. Gen. Stat. 143-422.2.  Before the court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below, Defendant's motion will be granted as to Plaintiff's hostile work environment and state wrongful discharge claims, and denied as to Plaintiff's Title VII retaliation claim.

FACTS

The following factual account, presented in the light most favorable to Plaintiff as the non-moving party, is based on deposition testimony and supporting affidavits and related documents. To the extent that Plaintiff's affidavit, submitted in support of her brief in opposition to summary judgment, contradicts or expands upon her previously given deposition testimony, it is disregarded. See, e.g., Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990) (noting that "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.") (internal citations omitted).

Plaintiff began working for Lowe's, a chain of grocery stores, on December 13, 1996, as an office clerk. Five years and three promotions later, she held the position of customer service manager at Lowe's store number 165. Her duties as customer service manager included staff scheduling, tending to cash registers, and interviewing potential new employees. Sometime in early 2002, Lowe's fired the manager of store 165 and replaced him with Ahmed Konteh ("Konteh"), who became Plaintiff's direct supervisor.

Soon after Konteh's arrival at store 165, he and Plaintiff clashed over the preparation of the weekly staffing schedule.

2

Konteh ordered Plaintiff to prepare it by Wednesday of each week so that he could review and revise it before posting it at noon each Friday. Plaintiff failed, at least at times, to comply with Konteh's demands, claiming that her work schedule, lack of adequate staff, and Konteh's interference prevented her from completing the schedule on time. In May 2002 Plaintiff raised concerns over the scheduling process with Paul Oathout, Lowe's human resource generalist assigned to the region including store 165, and he instructed her to resolve the situation with Konteh. Plaintiff told Oathout that she was not comfortable speaking with Konteh because of comments he had made to her regarding his desire to have a relationship with an older woman. Plaintiff is older than Konteh.

Plaintiff's problems with her scheduling duties persisted. In October 2002, Plaintiff met with Konteh to discuss her performance related to preparing staff schedules, among other things, and finally, on December 6, 2002, Konteh told Plaintiff that she would not be permitted to submit for payment the hours she spent working on the schedule at home or when she was otherwise not scheduled to work. Plaintiff became upset and, borrowing a pen and paper from Konteh's assistant manager, tendered her resignation in a handwritten notice.

Before leaving the store on December 6, Plaintiff called Bob Hays, Lowe's division manager with overall responsibility for

eighteen stores, including store 165.  Plaintiff and Hays arranged to meet on December 10, 2002.  At that meeting, Plaintiff told Hays that Konteh had sexually harassed her by telling her that he wanted a relationship with an older woman while running his fingers down her back.  Plaintiff also provided Hays a list naming several other female employees at store 165 whom Konteh had sexually harassed.

Hays told Plaintiff that she could return to work while an investigation into her allegations was made, explaining that if they were true, she should not have to resign.  Plaintiff agreed and resumed working until December 18, 2002.  On that day, Hays called her into a meeting and, according to Plaintiff, informed her that thus far, the investigation had substantiated part, but not all of her claims, and that he was "putting her resignation back on the table," meaning that Lowe's was accepting her December 6, 2002 resignation.  Plaintiff further testified that Hays implied that she should resign to avoid having her record show that she was fired.  Hays, for his part, testified that he gave Plaintiff the option of resigning or being placed on unpaid suspension pending the ultimate outcome of the investigation, and that if her claims against Konteh were found credible, she would be reinstated with back pay.  Hays said he offered Plaintiff this choice even though there was no provision for it in Lowe's company policies nor was it Lowe's standard practice.  Plaintiff

4

chose to resign rather than be fired (or, as Hays contends, suspended) and submitted another handwritten notice, backdated to December 6, 2002. Hays then had Plaintiff escorted immediately from the premises of store 165 allegedly to prevent her from influencing potential witnesses in the investigation.

On March 19, 2003, Plaintiff filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") alleging that Konteh subjected her to a hostile work environment by making derogatory remarks and sexual advances to her and to other female employees. She also claimed that she was fired for complaining about Konteh's conduct.

In the present action Plaintiff again complains that she was subjected to a hostile work environment created by Konteh's sexually harassing conduct. The conduct falls into two categories: sexual comments and unwelcome touching directed toward Plaintiff and similar conduct directed toward other female employees. As to conduct directed toward Plaintiff, Konteh rubbed her shoulders and ran his finger down her back on three or four occasions between March and May 2002, and on at least one such occasion did so while commenting that he would like to have a relationship with an older woman. Plaintiff testified that Konteh repeated such conduct despite her insistence that he stop. During April and May of 2002, Konteh described to Plaintiff his relationships with past girlfriends, stated that married people

5

should have sex with people other than their spouse, and described parties he attended where he engaged in sexual activity with strange women. Konteh further told Plaintiff that he wanted a woman with whom he could have sex without having to give her gifts, and also described his desire to drink wine and "lay back" and party with women. Beyond identifying the general period of "from March [2002] on," Plaintiff did not provide precise dates on which Konteh made such statements.

Of the conduct directed toward other employees, Plaintiff witnessed some incidents and was told of others by the targets of Konteh's advances. Plaintiff witnessed Konteh put his arm around Karen Simcox, who backed away in an effort to avoid his touching. She also watched as Konteh said to Simcox "shake that thing" in reference to Simcox's buttocks. Plaintiff could not recall the date of either event, except that the latter occurred sometime before December 2002. Plaintiff also overheard Konteh make a comment about the size of Lisa Johnson's breasts, although she could not recall the date of the comment. Plaintiff further overheard Konteh make jokes of a sexual nature, specifically while he was in the bakery department of store 165, and stated that he made such jokes on a weekly basis.

Simcox, Johnson, and Arletta Sides spoke with Plaintiff about other episodes of inappropriate behavior by Konteh. Simcox told her that Konteh made sexually suggestive comments to her and

6

attempted to put his arm around her on a regular basis. Plaintiff did not recall a date when she spoke with Simcox. According to Plaintiff, Johnson complained to her of Konteh's inappropriate behavior several times, beginning in the summer of 2002, when Johnson told her that Konteh remarked to her about the size of her breasts and that he suggested she change the name of her youngest child to his name. Plaintiff also said that Johnson spoke with her up to two or three times per week complaining that Konteh was "awful" and that she feared she would lose her job because of him. Although Plaintiff did not provide a date for any conversation with Johnson, Johnson, in an affidavit, stated that she began working at store 165 on September 11, 2002, and that Konteh's harassment began two weeks later. Johnson stated in the affidavit that she told Plaintiff of Konteh's actions in early December 2002. Finally, Plaintiff stated that in October or November 2002, Sides spoke with her about comments Konteh made. Sides stated, according to Plaintiff, that Konteh said he wanted to sleep with Sides and described his desire to engage in sexual activity with two women at the same time. Sides told Plaintiff that Konteh's comments "made her sick" and that she would have to leave her job at Lowe's because of him. Sides did not tell Plaintiff when Konteh made these comments.

Plaintiff identifies two other women who suffered Konteh's harassing conduct, Rayetta Robinson and Gena Cline. On one

7

occasion Konteh followed Robinson to a mall.  Plaintiff testified that Robinson called an employee at store 165, who in turn called Plaintiff to ask how Robinson should handle the situation. Robinson never spoke with Plaintiff directly about the incident, although Plaintiff expressed some concern to Robinson after overhearing her mention the incident to another employee. Plaintiff did not provide a date for these events or conversations.

Plaintiff testified that Konteh also harassed Cline, and Cline provides an affidavit detailing Konteh's conduct. Plaintiff further testified, however, that she did not learn of Cline's trouble with Konteh until she read that affidavit.  Thus, regardless of the nature of Konteh's conduct against Cline, it could not have contributed to a hostile work environment suffered by Plaintiff.  Cline's affidavit and Plaintiff's testimony related to Cline are therefore given no consideration.  The affidavits of Johnson, Sides, and Simcox are considered only to the extent they confirm Plaintiff's awareness of Konteh's sexually harassing conduct during her tenure at store 165, such that it may be determined whether Plaintiff has established a <u>prima</u> <u>facie</u> case that she suffered a hostile work environment based on Konteh's conduct.

DISCUSSION

Summary judgment must be granted when the pleadings, responses to discovery, and the record show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of persuasion on all relevant issues. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. See Fed. R. Civ. P. 56(e); see also Cray Communications, Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 393-94 (4th Cir. 1994) (moving party on summary judgment may simply argue the absence of evidence by which the non-moving party can prove her case). The non-moving party may survive a motion for summary judgment by producing "evidence from which a [fact finder] might return a verdict in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). In considering the evidence, all reasonable inferences must be drawn in favor of the non-moving party. Id. at 255. However, "the mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient; there must be evidence on which the [fact finder] could reasonably find for the plaintiff." Id. at 252.

Title VII provides that:

> It shall be an unlawful employment practice for an employer--
>
> > (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

42 U.S.C. § 2000e-2(a)(1). To state a claim of sexual harassment under this provision, Plaintiff must show that "(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." Spicer v. Virginia, 66 F.3d 705, 710 (4th Cir. 1995) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 20 (1993)).

A charge against an employer under Title VII "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). "A claim is time barred if it is not filed within [this] time limit." Morgan v. Amtrak, 536 U.S. 101, 109 (2002). An unlawful employment practice can take the form of a discrete act or it may arise in the form of repeated conduct that creates a hostile work environment. Id. at 115. In a claim based on a discrete act, such as a refusal to hire or promote based on a protected status, the act must have occurred within 180 days of the filing of the

10

EEOC charge. Related discrete acts do not constitute a single unlawful employment practice for purposes of the filing period, thus "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." Id. at 112.

In contrast, a hostile work environment claim is based on repeated conduct that, taken as a whole, creates an abusive work environment. Id. at 115. "The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id. Instead, hostile work environment claims "are based on the cumulative affect of individual acts." Id.

> It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

Id. at 117.

The question presented here is whether any "act contributing to the claim" occurred within the filing period.

> [W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

11

> utterance; and whether it unreasonably interferes with
> an employee's work performance.

Harris, 510 U.S. at 23.  Plaintiff could not recall the exact dates of any harassing conduct Konteh directed toward her.  She claims that Konteh rubbed her back three or four times between March and May 2002, and that he made overtly sexual comments to her during the same time period.  Konteh repeated his conduct three or four times despite Plaintiff's rejection of his advances and her request that he leave her alone.  Such acts may well contribute to a hostile work environment, but they obviously occurred outside the 180-day period that ended with the filing of Plaintiff's EEOC charge on March 19, 2003.  Thus, to consider such acts for purposes of Defendant's liability, Plaintiff must identify some other act that occurred within the filing period.

The remaining acts Plaintiff complains of were all directed toward employees other than Plaintiff.  Of these acts, Plaintiff witnessed at most three incidents:  she saw Konteh attempt to put his arm around Simcox, who moved to avoid his unwelcome touching, and, either then or at another time, overheard Konteh tell Simcox to "shake that thing."  She also overheard Konteh comment on the size of Johnson's breasts.  Plaintiff does not recall precisely when any of these events occurred.

Plaintiff did not witness any other harassing conduct, but was informed by Simcox, Johnson, and Sides of additional incidents involving Konteh.  Plaintiff did not say when she spoke

with Simcox or provide dates for the transgressions they discussed. She spoke with Sides in October or November 2002; neither she nor Sides provided any information as to the dates of the conduct they discussed. Johnson, in her affidavit, stated that she spoke with Plaintiff about Konteh's harassment in December 2002 and that all of the actions she discussed with Plaintiff occurred in or after the final week of September 2002. Those acts would, therefor, fall within the 180-day filing period.

"In examining the totality of the circumstances, the court can consider conduct targeted at those other than Plaintiff . . . [but the weight of such] 'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." Brown v. Hous. Auth. of Calvert County, 150 F. Supp. 2d 856, 863 (D. Md. 2001) (citing McPhaul v. Bd. of Comm'rs of Madison County, 226 F.3d 558, 567 (7th Cir. 2000)). See also Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998); Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 782 (10th Cir. 1995); and Hall v. Gus Constr. Co., 842 F.2d 1010, 1015 (8th Cir. 1988) and cases cited therein. Thus, an act against an employee other than Plaintiff may be considered for purposes of determining the timeliness of her hostile work environment charge. Such an act, however, must have actually contributed to the hostile work environment Plaintiff claims to

13

have suffered.  This court is not prepared to say, in the
circumstances presented here, in which Plaintiff can point to no
direct sexual harassment within ten months of her EEOC charge,
and no harassment of others that she actually witnessed within
the filing period, that harassing conduct toward others, which
Plaintiff neither suffered nor witnessed, but was merely told
about within days of her resignation, is an act that contributes
to a hostile work environment suffered by Plaintiff.  A
conversation about such acts, of course, is not an act
attributable to a defendant in any case.  That is not to say that
Konteh's behavior was appropriate or acceptable, but only that it
does not appear that his conduct toward Johnson, the only conduct
identified as having occurred within the statutory period and
that Plaintiff claims to have been aware of, contributed to a
hostile work environment suffered by Plaintiff.

Plaintiff further claims that she heard Konteh curse and
tell sexual jokes throughout 2002.  Konteh's cursing occurred at
meetings with both male and female employees, and he avoided
using such language after it was brought to his attention that
some employees found it upsetting.  Even if it occurred during
the statutory period, Konteh's cursing is not an act that
contributed to a hostile work environment based on Plaintiff's
sex.  As for Konteh's jokes, Plaintiff could not recall the
details of any joke, but stated that they often referred to a

14

woman's breasts or buttocks.  While "[a] work environment consumed by remarks that intimidate, ridicule, and maliciously demean the status of women can create an environment that is as hostile as an environment that contains unwanted sexual advances," <u>Smith v. First Union Nat'l Bank</u>, 202 F.3d 234, 242 (4th Cir. 2000), the scant detail provided by Plaintiff suggests that Konteh's jokes were not severe or humiliating enough to amount to more than a mere offensive utterance.  <u>Harris</u>, 510 U.S. at 23; see <u>Smith</u>, 202 F.3d at 243 n.6 (identifying comments that, taken together, were sufficiently severe and pervasive to support a hostile work environment claim.)[1]  Plaintiff's hostile work environment claim must, therefore, be dismissed as untimely.

---

[1] In <u>Smith</u>, the offending comments were as follows:
(1) Scoggins would have preferred a male in the team leader position because males are "natural leaders"; (2) Smith would "crack" because women "are not emotionally capable of handling the management role"; (3) Scoggins would frequently remark to Smith that a woman who was upset "must be menstruating" or that she needed "a good banging"; (4) women were "out to get him" and that women generally conspire with each other against men; (5) Scoggins wished he were a woman so that he could "whore his way through life"; (6) Smith was lucky to have her job, and she would not get any further at First Union because she was not attractive; (7) the "only way for a woman to get ahead at First Union is to spread her legs"; (8) women had no place in management and did not even belong in college; (9) women should be "barefoot and pregnant"; (10) women go through life looking for a man to marry; (11) a female supervisor was "sleeping her way to the top" and therefore she was a "classic example of why women should not be in management"; (12) women's hormones do not allow them to handle work matters in a professional manner. <u>Smith v. First Union Nat'l Bank</u>, 202 F.3d 234, 243 n.6 (4th Cir. 2000).

15

Plaintiff's wrongful discharge claim under N.C. Gen. Stat. 143-422.2 must be dismissed as well. Plaintiff contends that her December 18, 2002, resignation was actually a constructive discharge in that Lowe's intended to make her working conditions so intolerable that she was forced to resign. In a recent expansion of North Carolina law, constructive discharge may give rise to a claim of wrongful termination in violation of North Carolina public policy. See <u>Whitt v. Harris Teeter, Inc.</u>, 165 N.C. App. 32, 41 (2004). The North Carolina Court of Appeals determined in <u>Whitt</u> that the plaintiff "presented sufficient evidence that her termination of employment was predicated upon sexual harassment in violation of public policy" and then concluded that a constructive discharge, in addition to explicit discharge, may support a wrongful termination claim. <u>Whitt</u>, 165 N.C. App. at 39, 41. Here, Plaintiff does not contend, nor has she presented sufficient evidence, that Konteh's sexual harassment made her work conditions so intolerable that her resignation was in fact a constructive discharge. Instead, Plaintiff contends that she was constructively discharged in retaliation for complaining about Konteh's conduct. "North Carolina does not recognize tort claims . . . [for] wrongful discharge in retaliation for complaints of sexual harassment." <u>Lowe v. Unifi, Inc.</u>, 292 F. Supp. 2d 773, 790 (M.D.N.C. 2003) (citing <u>McLean v. Patten Cmtys., Inc.</u>, 332 F.3d 714, 719 (4th

16

Cir. 2003) ("There is no private right of action under North Carolina law for retaliation under § 143-422.2.")). <u>Whitt</u> does not, as Plaintiff contends, mark a change in North Carolina law in this regard. See <u>Efird v. Riley</u>, 342 F. Supp. 2d 413, 429 (M.D.N.C. 2004) (finding "no definitive statement in <u>Whitt</u> . . . indicating that the North Carolina courts now recognize a claim for wrongful discharge in violation of public policy based on a termination in retaliation for complaining about sex discrimination.") Thus, Plaintiff's state law claim for wrongful termination must be dismissed.

Plaintiff's termination from Lowe's does raise genuine issues of fact that render summary judgment inappropriate for her Title VII retaliation claim. "In order to establish a prima facie case of retaliation, an employee must present evidence that she engaged in protected activity, that her employer took an adverse employment action against her, and that there was a causal connection between the two events." <u>Anderson v. G.D.C., Inc.</u>, 281 F.3d 452, 458 (4th Cir. 2002). "Once the plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for the adverse employment action. If the employer succeeds in doing so, the plaintiff must then demonstrate that the employer's asserted reason is simply a pretext for retaliation." <u>Id</u>. (internal citations omitted.)

17

Case 1:04-cv-00178  Document 29  Filed 05/26/05  Page 17 of 19

In the light most favorable to Plaintiff, the circumstances of her initial resignation, rehiring, and ultimate termination suggest that, upon Lowe's determination that her sexual harassment claims were without merit, she was fired. An employer cannot take adverse action against an employee merely because the employee's complaints of sexual harassment could not be substantiated, as even non-meritorious Title VII claims are protected activities. See Ross v. Communications Satellite Corp., 759 F.2d 355, 357 n.1 (4th Cir. 1985), overruled on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (noting that "An underlying discrimination charge need not be meritorious for a plaintiff to prevail on a claim of retaliation for opposition to the perceived discrimination.") Defendant's motion for summary judgment on Plaintiff's retaliation claim is therefor denied.

CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment will be granted as to Plaintiff's hostile work environment claim under Title VII and wrongful discharge claim under North Carolina law. Defendant's motion will be denied as to Plaintiff's Title VII retaliation claim.

18

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

May 26, 2005                                    _____
                                                United States District Judge